**IN RE: Brenda A. OGDEN, Debtor.**

**Brenda A. Ogden, Plaintiff,**

**v.**

**PNC Bank, N.A., Defendant.**

**Bankruptcy Case No. 11–19841 EEB**
**Adversary Proceeding No. 13–1054 EEB**

United States Bankruptcy Court,
D. Colorado.

Signed April 3, 2014

Matthew R. Osborne, Northglenn, CO, for Plaintiff.

Patrick H. Pugh, Denver, CO, for Defendant.

## AMENDED ORDER

Elizabeth E. Brown, Bankruptcy Judge

THIS MATTER is before the Court following a trial on the Debtor's claims that PNC Bank, N.A. (the "Bank") violated the automatic stay, the confirmation order, the Debtor's chapter 13 plan, and Fed. R. Bankr.P. 3002.1. The primary issue in this case centers on when and to what extent the bankruptcy court has the authority to police a mortgage lender's accounting for payments received postpetition but before the completion of a debtor's plan.

## I. BACKGROUND

The Debtor and the Bank have had a strained relationship involving more than one instance in which the Debtor has alleged misapplication of her mortgage payments. The Debtor testified that the Bank misapplied her October, 2010 mortgage payment to old, uncollectable charges, then declared her loan in default and commenced foreclosure, resulting in this bankruptcy filing when she was unable to resolve the issue without the assistance of the Court. Postpetition, the Debtor filed a lawsuit against the Bank in federal district court, alleging violations under both the Real Estate Settlement Procedures Act of 1974[1] ("RESPA") and the Truth in Lending Act. The parties settled that lawsuit in June 2012, resulting in the Bank paying $5,000 to Debtor, agreeing to reduce the principal balance of her loan by $12,500, and further agreeing to immediately apply any excess payments received from the Debtor toward principal reduction (the "Settlement"). Ex. N. The Settlement required the Bank to apply the $12,500 principal credit to the Debtor's mortgage no later than July 1, 2012, but the Bank did not process the reduction

---

1. As amended and codified at 12 U.S.C. § 2601 et seq.

until January 2013, after the Debtor filed this adversary proceeding.[2] This history has engendered distrust and a profound breakdown in communication between these parties, leading to the present disputes.

At the time Debtor filed her chapter 13 petition on April 28, 2011, she was seven months in arrears on her mortgage payments. The Bank, as the servicer for this loan, filed a proof of claim asserting prepetition arrears due of $10,497.39, which included not only the missed payments, but also escrow advances made by the Bank and various foreclosure fees and costs. Ex. 4. The Debtor's chapter 13 plan, confirmed on March 12, 2012, provides for full cure of these arrears as well as continued monthly postpetition payments, which are to be paid directly to the Bank.

In December 2012, the Debtor sent the Bank a letter requesting an explanation of a notification she had received from the Bank significantly decreasing her monthly payment. Ex. P. She also requested a loan payment history, a reinstatement quote, and a payoff quote. Over the next two months, she received only form letters that provided no information other than a statement that the Bank was researching her loan. Ex. T. Shortly before this adversary proceeding was filed on January 29, 2013, the Bank sent the Debtor an escrow analysis increasing the amount of her monthly escrow payment by more than $140. As required by Rule 3002.1, the Bank filed its notice of the payment change on January 26, 2013 with the escrow analysis attached. Ex. D.

During a deposition in this case, the Bank finally provided an August 15, 2013 reinstatement quote to the Debtor, but it included additional postpetition fees and corporate advances in excess of $5,500. Ex. 6. The Bank's representative, Dorothy Thomas, testified that this reinstatement quote was the amount necessary to bring the loan "contractually current,"[3] but that it was not a final reinstatement quote because it did not appear on the Bank's letterhead. She testified that the use of letterhead is significant because it means that it has been reviewed by the Bank's counsel to see if it includes anything that would not be collectable—such as fees and corporate advances. There was no indication, however, that the Bank shared this information with the Debtor prior to trial. No one from the Bank ever explained to the Debtor that she had to request an attorney review in order to obtain an accurate reinstatement quote.

Ms. Thomas attempted to eliminate the confusion by explaining that the Bank keeps essentially two sets of books to reflect the Debtor's postpetition mortgage payments—one for bankruptcy purposes and one that accounts for the loan as if she had not filed for bankruptcy. For bankruptcy purposes, each postpetition payment is applied to the month and year in which the payment is actually received. Exs. I, J. For non-bankruptcy purposes, payments are applied to the oldest outstanding payment due in accordance with the Debtor's deed of trust. Ms. Thomas

---

**2.** The Bank's representative testified that, although the required principal reduction was not processed until January 2013, it was applied effective as of December 2011. In January 2013, the Bank also backed out and reapplied all payments made on the Debtor's loan after December 2011, in order to adjust how much of each payment was applied to principal and interest due to the resulting lower principal balance of the loan.

**3.** In other words, the draft reinstatement quote provided by the Bank essentially ignores the bankruptcy by providing numbers as if the Plaintiff were not curing the prepetition arrears through her plan.

testified that, while the Debtor is not "contractually current" on her loan because the prepetition arrears have not yet been paid in full, she is and has always been "postpetition current"—meaning she has made all of her scheduled postpetition mortgage payments. The reason the Bank uses two forms of accounting is because, unless the Debtor completes her plan, she will remain subject to all of the terms of her promissory note and deed of trust, including the accrual of late fees and the like. According to Ms. Thomas, if the Debtor completes her plan, the Bank will "true up" the accounting for her loan, and it will be as if she had never been in default. Ms. Thomas believes that there is no harm in continuing to account for the loan on a contractual basis because this form of accounting has never caused the Bank to send the Debtor any postpetition default notices, demand letters, or requests for payment.

## II. DISCUSSION

The Debtor asserts that the Bank has violated the automatic stay and the confirmation order by applying her postpetition mortgage payments to prepetition arrears and by charging postpetition fees and expenses to her loan without compliance with Fed. R. Bankr.P. 3002.1 (the "Chapter 13 Mortgage Rule" or the "Rule"). She further contends that the Bank violated the automatic stay by raising the amount of her postpetition monthly payment to recover prepetition escrow arrears. The Debtor seeks damages for emotional distress, attorney's fees and costs, and punitive damages.

### A. The Bank's Method of Accounting for Postpetition Mortgage Payments and Its Accrual of Postpetition Fees and Charges

■ The Debtor asserts that the Bank's accounting practices violate the automatic

stay, her confirmed plan, and the Chapter 13 Mortgage Rule by applying her postpetition payments to the oldest contractually due payment, contrary to her plan, as well as by tacking on numerous postpetition fees and charges. She asserts that this method of accounting results in her being charged more interest and receiving less principal reduction than she would otherwise realize. Understandably, she wants to resolve this problem as early as possible. The problem is that the Bankruptcy Code and the Chapter 13 Mortgage Rule provide only limited oversight by the bankruptcy court during the term of the plan.

Any analysis of the Court's role in resolving this dispute must begin with the Code itself. According to § 1327(a), "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan." 11 U.S.C. § 1327(a). Thus, once it is confirmed, the chapter 13 plan binds the mortgage creditor to apply payments in the manner specified by the plan. On successful completion of the plan, the debtor receives a discharge. After discharge, the "willful failure" of a creditor to credit payments received under a confirmed plan in the manner specified by the plan "shall constitute a violation of the [discharge] injunction ... if [the failure] caused material injury to the debtor." 11 U.S.C. § 524(i). While this latter section of the Code provides a remedy to address the recalcitrant creditor, it does so only after the debtor has received a discharge, which will not occur in a chapter 13 proceeding until the debtor has completed the plan payments. 11 U.S.C. § 1328(a).

The recently enacted Chapter 13 Mortgage Rule provides for limited oversight

by the bankruptcy court during the term of the plan.[4] Prior to the Rule's adoption, a chapter 13 debtor ran the risk of completing the plan and being discharged, only to discover after the case was closed that she owed hundreds or thousands of dollars of non-discharged postpetition fees, expenses, and charges on her mortgage and that she was facing a risk of foreclosure. The new Rule attempts to solve this problem by requiring the holder of the claim to file and serve notices of payment changes no later than twenty-one days before the new payment is due, and by requiring notices itemizing all postpetition fees, expenses or charges that the holder asserts are recoverable against the debtor or her residence within 180 days after the date on which they are incurred. Fed. R. Bankr.P. 3002.1(b)-(c). It establishes a procedure for court determination if the debtor objects to the notices within one year. Fed. R. Bankr.P. 3002.1(e). On completion of the plan, the Rule allows parties to obtain a determination that the debtor's mortgage is deemed current. Fed. R. Bankr.P. 3002.1(f)-(h).

In this case, the Bank has filed only three notices in compliance with the Rule—one reflecting the trial payment plan the Debtor says she did not request and two reflecting payment changes attributable to escrow requirements. It has not filed any notices to reflect the additional $5,500 in postpetition charges and fees set forth in the August 15, 2013 reinstatement quote. Ms. Thomas testified that, as long as the Debtor completes her plan payments, it will not seek to collect these added fees and charges. If the Debtor fails to complete her plan, then Ms. Thomas believes the Bank will be able to charge all amounts contractually due under its note and deed of trust, including this same $5,500. This may be a faulty assumption on her part for two reasons.

First, the Rule prescribes a 180-day deadline for filing a notice that begins when each postpetition charge or fee is incurred. Fed. R. Bankr.P. 3002.1(c). Based on this Rule, it would be logical to conclude that the fees and charges will no longer be collectable against the Debtor or her home if the Bank fails to comply with this provision. Subsection (i), however, sets forth the consequences for failure to provide notices. It provides that the Court "may" (as opposed to "shall") either preclude the mortgage holder from presenting "the omitted information, in any form, as evidence in any contested matter or adversary proceeding in the case, unless the court determines that the failure was substantially justified or is harmless," or award "other appropriate relief, including reasonable expenses and attorney's fees caused by the failure" to the debtor. Fed. R. Bankr.P. 3002.1(i). Whether "other appropriate relief" includes the ability to preclude the mortgage holder from later collecting the fees and charges is an open question.

Second, the Bank assumes that the notice provisions of this Rule only have a lasting effect if the Debtor completes her plan. This Rule expressly states that it only applies in chapter 13 cases to claims that are "secured by a security interest in the debtor's principal residence, and ... [that are] provided for under § 1322(b)(5) ...." Fed. R. Bankr.P. 3002.1(a). But it makes no mention of whether the notice requirements of sub-

---

4. This Rule became effective on December 1, 2013. To the extent that the Rule varies the terms of § 524(i), which only provides for oversight after the completion of the plan and entry of the discharge, it may be invalid. Rules cannot vary the terms of a statute. *Branchburg Plaza Assoc., L.P. v. Fesq (In re Fesq)*, 153 F.3d 113, 116 (3d Cir.1998) (quoting 28 U.S.C. § 2075).

sections (b) and (c) have a continuing effect in the event that a debtor later obtains a hardship discharge, modifies her plan, or converts to a chapter 7 proceeding. These are issues for another day, but the Court mentions them here because, given the history between these parties, the Bank should think long and hard before it later asserts a claim that includes fees and charges of which it did not give notice in compliance with the Rule.

■ In any event, stepping back and viewing the overall framework established by these Code and Rule provisions, the Court is left with the conviction that Congress intended for the bankruptcy court's role in supervising mortgage lenders to be limited in scope. At present, the Bank is not attempting to collect or assert a default based on these additional fees and charges. The Court must accept Ms. Thomas' testimony on its face that, if the Debtor completes her plan payments, the Bank will "true up" her loan at the end of the plan. If it fails to do so, this Court will stand ready, willing, and able to enforce § 524(i)'s sanctions. The Debtor may preempt subsequent litigation by invoking the Rule's "notice of final cure payment" provisions under subsection (f) to obtain a court order declaring the loan to be current. The Court acknowledges that this may be an imperfect solution. If the loan is deemed "current," but the Debtor has not received as much principal reduction as she should have realized, then this may be of little comfort to the Debtor.

A better solution may lie outside of the bankruptcy world. As this Debtor knows well already, RESPA contains procedures for requesting information from a loan servicer, sets deadlines for the servicer's response, and imposes sanctions against a servicer who either fails to provide a timely response or to correct the borrower's account. *See* 12 U.S.C. § 2605(e), (f),

(k)(1)(C); 12 C.F.R. §§ 1024.35, 1024.36 (2013). When a borrower makes a "qualified written request," including a statement of the reasons for the borrower's belief that the account is in error, the servicer is then given a deadline within which to make appropriate corrections to the account, including crediting any late charges or penalties, and to transmit to the borrower written notification of the correction or details about why the servicer believes the account is correct, along with the name and telephone number of a representative who can assist the borrower. 12 U.S.C. § 2605(e)(2) and (k)(1)(C). If the servicer fails to comply with any of these provisions, then the borrower may recover actual damages and costs resulting from the failure. *Id.* § 2605(f)(1)(A). The court may also award additional damages not exceeding $2,000 if there is a pattern or practice of non-compliance. *Id.* § 2605(f)(1)(B). A suit to enforce the borrower's rights may be brought in either federal district court or in any other court of competent jurisdiction within the district in which the subject property is located, or where the violation is alleged to have occurred. *Id.* § 2614. It must be filed within three years. *Id.*

## B. Increases in the Debtor's Escrow Payments

■ The Debtor is convinced that the Bank has been attempting to improperly collect her prepetition escrow arrears, already accounted for in her plan, by increasing her postpetition escrow payments in January 2013. This is not the case. The increase in her monthly escrow payment is attributable to the increase in the amount of the Debtor's real estate taxes and insurance costs. But the Court understands why this was not readily apparent and the Court fully understands why the Debtor is frustrated and mistrusting of the

Bank's accounting methods. The Bank has made so many errors in accounting for her loan that it is like trying to untangle the Gordian knot.

At the same time that the Bank was attempting to complete a reconciliation to effectuate the terms of the Settlement and to account for the plan of reorganization, the Debtor's escrow account came up for annual review. In analyzing the Debtor's escrow history, the Bank wanted to account for the fact that the Debtor would be paying the prepetition escrow arrears through her plan in order to avoid an unnecessary increase in her future escrow payments. To do so, it gave her credit in the escrow analysis for the missed prepetition payments. It would have been clear and simple if the Bank had given her credit for seven missed escrow payments, corresponding with the seven missed prepetition mortgage payments. Instead the Bank gave her credit for ten escrow payments. Two of the additional credits were attributable to months in which her postpetition payments had been made during the escrow analysis and reconciliation period and, thus, the Bank had not yet accounted for these two payments. The third additional credit was a mistake, but a mistake in the Debtor's favor. In any event, the increase in her payments did not reflect a recoupment of prepetition escrow shortages, but only an increase in her ongoing taxes and insurance costs.

This brings us to a separate and earlier postpetition increase in the Debtor's escrow payment that is attributable to a prepetition escrow shortage fee of $45.94. This amount was not included in the Bank's proof of claim. According to the Bank's internal notes, the Bank did not include it because the amount 'was under $300.' Ex. 14, at p. PNC–Ogden 057,

031213 entry. Instead, from April 2011 through March 2012, the Bank increased the Debtor's monthly escrow payments by approximately $3.83 to collect this prepetition shortage. Ms. Thomas attempted to convince the Court that it was a postpetition charge, but her testimony was not consistent with the Bank's own internal notes. *Id.* Thus to the extent of $45.94, the Bank improperly attempted to collect a prepetition debt from the debtor in violation of the automatic stay and the plan of reorganization. The Bank argues that any claim attributable to this violation is barred by the general release in the parties' June 2012 settlement agreement. Regardless, it is difficult for the Court to assess any damages attributable to this minor amount, especially in light of the fact that the Debtor received an additional postpetition escrow payment credit in the amount of $207.08.

## III. CONCLUSION

Accordingly, it is hereby ORDERED that Debtor's claims for violation of the automatic stay, the confirmed plan, and Fed. R. Bank. P. 3002.1 are DISMISSED without prejudice.